Good morning, Your Honors. My name is Melissa Fixall, and I represent the appellant here, Mr. Mark Olson. I understand that I have 10 minutes. I have reserved 3 minutes for rebuttal, if that's possible. May it please the Court and counsel? Your Honors, this case is a case that involves a gun that was improperly admitted into evidence. On behalf of Mr. Olson, I would respectfully request that the Court review the case and agree that there was an abuse of discretion by the lower court because there was not a proper showing of a chain of custody. Now, the Robinson case, United States v. Robinson That would mean another trial. Yes, Your Honor. United States v. Robinson tells us that the chain of custody does not have to be perfect, and that necessarily the government is not required to call every witness. Where did it break down in this case? Well, I think that it broke down from the very beginning. It was very muddled at the onset. We have about 3 or 4 different detectives here that were involved in this particular Was it Officer Knackreiner who first took possession? Yes. Detective Billings was the person that initially handcuffed Mr. Olson. Knackreiner was with him and removed the gun from Mr. Olson's person inside the store. They had asked if they had a weapon on him. He pointed to his left side, and they removed the weapon from his pants, pocket, and Was it then delivered to any other officer? Well, that's where it gets muddled, and the trial testimony will tell you that. Did Christensen ever get it? Christensen did at one point get the gun. The testimony at trial was that he received it from Knackreiner, took the gun from Knackreiner, went out of the store and rendered it safe, and then went ahead and placed it in Detective Holbeck's vehicle. Detective Holbeck testified that the vehicle was then either in his presence, in his vehicle, or it was locked in Detective Holbeck's vehicle at the time. However, there was a lot of misinformation or miscommunication during testimony because Was it understood then that Detective Mihaljevic took it to evidence from the vehicle? That's questionable because there were two different reports that were written. Detective Christensen testified that he didn't write a report immediately because there was a lot of confusion at the scene, and he thought Detective Billings was going to do the report. But then Detective Holbeck did actually write a report at the time of the arrest. Well, confusion about the report is not the same as confusion about whether the gun is the gun that was taken from him. I understand that. But when we're talking about where the gun was and who put the gun into evidence, there was definitely confusion, considering that Detective Billings was actually the detective that signed it into evidence. And Mihaljevic testified that he was the one that placed it into evidence. And so that's, I think, where a lot of the confusion lies. Again, What's your theory here, that this was a different gun? No, the theory is that the gun was tampered with. Tampered with by somebody in the police department? Yes, Your Honor, by one of the officers. To do what? To make those scratches? Correct. To obliterate the serial number. Now, why is that? Well, first of all, was it really obliterated? Or was it legible, but just scratched? I would tell you that I believe that there was testimony during the trial that the expert that testified for the government would say that it was scratched, but that he could still recognize it. In candor to the court, there was also testimony that indicated there are at least one or two other areas on the gun where the serial number is located. So this is more of a tampering claim than a chain of evidence claim, or a claim that it's not the actual gun, but a claim that the actual gun was somehow altered? Yes, Your Honor. But how does that prejudice your client, even if it was scratched? I mean, he wasn't charged with the serial number offense. I understand that. He was not charged with the separate offense of being in possession of a weapon with an obliterated serial number, nor was he given the enhancer. Is there a theory of prejudice, then, as to how the scratching would have affected the verdict? The theory of prejudice would be that the weapon shouldn't have been allowed in, the gun itself shouldn't have been allowed in. That argument is complicated by the fact that we still have ammunition in my client's pocket that would have fallen under that statute. And so I have to concede the government's argument in that respect, that there was ammunition in addition to the weapon in his pocket. Right. But I was thinking even as to the gun, how were you harmed? Well, I think that, I think that if it was a situation where the jury knew that the weapon had been tampered with or had reason to believe it had been tampered with, I think the outcome would have been different. I think that that was. What was the charge against the defendant? The charge was being a felon in possession of a weapon, a firearm. Would the alteration have affected the possession? No, Your Honor, because of what he was charged with. Going on to the tampering part, I'll just fill out, just fill in the court and explain the tampering. This is an issue where the argument is that there was some bad faith or ill will on behalf of law enforcement. Mr. Olson argues that the gun was substantially changed when it was taken into custody, and that was by having that serial number scratched and tampered with. So our argument is that he demonstrated, that there was demonstrated bad faith and ill will, and the reason for that is that, and the reason that was borne out at trial was that there was, had been substantial contact with Mr. Olson in the past. He was concurrently being investigated by the South, the Sioux Falls Area Drug Task Force for trafficking in narcotics. He was on parole, had been absconded from the parole, had not been on parole for very long, but was absconding. He was, as the time he was pulled over, was in possession of a stolen vehicle. Law enforcement was investigating him and watching him at his home and followed him actually into the auto parts store. It's fixed until you're within your rebuttal. You can continue if you'd like, or you can reserve it. Thank you. I'd like to reserve the remainder. Thank you, Your Honor. Ms. Ebert. Good morning. May it please the court and counsel, my name is Elizabeth Ebert and I represent the United States in this matter. I'm asking you to affirm all convictions in all respects, and I'd like to make three points in support of that. First, I'll talk about the chain of custody. Second, I'll talk about the scratch. And third, if there was any error, it was absolutely harmless. First, with the chain of custody, every single person who touched and handled or had that gun in their possession from the moment it left Mr. Olson to the moment it was logged into evidence was made available at trial, testified at trial, and was subject to meaningful cross-examination. There is no one else to call as a witness in the chain of custody. There is no one else for defense to confront in the chain of custody, as everyone was made available at the trial. And not only that, I submit to you that the record supports the notion, or supports the fact, rather, that every — the gun was never unaccounted for from the moment it left Mr. Olson's possession to the moment it was entered into evidence at trial. Second? But what's the implication of potential altering of the firearm? I — the altering of the firearm, it needs to be substantially in the same condition to be offered into evidence. That it's substantially the same piece of evidence that was taken from Mr. Olson. The scratch is irrelevant. The scratch does not change the condition of the gun. The serial number — there were two serial numbers on this clock. As the expert witness, Brent Fair, testified, that he had no problems discerning the serial number on the firearm. Which then negates any threat of an obliteration charge. That scratch was not used against Mr. Olson. Was there ever an obliteration charge? No. There was never one. This is a superseding indictment, sure. But that was to add the drug charge, not to affect anything to do with count one, the felon in possession of the ammunition in the firearm. The scratch on the gun — additionally, there's evidence at trial from Detective Holbeck that the scratch existed the day of the — that it was seized. His testimony, it was on transcript — trial transcript page 78, that he testified that he remembers seeing scratches on the gun that day. So the notion that it happened in official's custody or possession is not founded in the record. And third, I would — well, it's just harmless error — not harmless error, excuse me. Whether there were scratches on the gun does not negate his possession of a firearm. He — there are — there's a plethora of evidence in the record of how he possessed a firearm, if not exactly this firearm. And it's not contested that he possessed ammunition that was also prohibited. Is that correct? Exactly. Yes, that was Exhibit 4. That came in without objection. And he is also prohibited of that. The evidence in support of him in possession of a firearm, not only in appellant's brief that they concede that he was in possession of a firearm, he also on the scene when asked if he had any weapons on him, he directed the officer to his front pocket. In his jail phone call, he talks to his brother, I believe it was, that he were talking about the gun. There's also photos. There's body cam of them pulling the gun off of Mr. Olson. There's also Facebook photos of him holding weapons, holding a firearm, multiple firearms. And then the DNA results, Your Honors. Exhibit 34 is the DNA results of Mark Olson's DNA on that firearm, Exhibit 3, that was seized from Mr. Olson's person. The standard here, as you know, is abusive discretion. If there was an error, that error is certainly harmless in light of all of the other evidence in support of this conviction. There was a discrepancy, what Ms. Fickstall was alluding to in the chain of custody, the discrepancy in the testimony that perhaps Detective Holbeck's testimony differed from his report. However, a discrepancy does not go to admissibility of the gun, but it goes to the weight of the evidence. And it was something that the jury, we must presume, did assess in coming to their conclusion of the conviction. Additionally, Judge Schreier, Judge Schreier exercised her discretion, as the record reflects, that the government attempted to offer this gun to multiple witnesses before Detective Mihaljevic, as they were able to recognize it as the gun pulled from Mr. Olson, as well as the distinctive markings, the blue inlay on the gun. And Judge Schreier sustained those objections, that she did not let it in for those first several witnesses, and she sat on the record and made a very, very clear well-established record that she, because there was no stipulations here, every part of the chain of custody needs to testify before she allowed that in. Once that happened, she allowed it in. This is showing that she exercised her discretion in support that there is no abuse of discretion here. As far as authority, Your Honors, I point to the USB Johnson case at 688 F3rd 4494, that's the Eighth Circuit from 2012, as well as the Robinson case from 2010. There were no gaps in the chain of custody. The gun was in the same condition as when pulled from Mr. Olson. And not only that, the appellate argues that there is a showing of ill will or bad faith or tampering, and while those questions were asked of each witness, of some of the witnesses, excuse me, that showing was never actually made. She asked, for example, Detective Christensen, did you drop the gun? Did you scratch the gun? No, I don't believe I did. His testimony is backed up by the body cam video that shows him clearing the gun in the parking lot, and he does not drop it. He secures it. It would not have produced, his handling of it would not have produced a scratch. Additionally, Detective Mihaljevic, I don't believe, was asked, did you scratch the gun? Did you drop the gun? He was never asked that. Those questions of tampering were asked. The evidence of tampering was never established. Accordingly, that gun is presumed to have its integrity. Gentlemen, if there are no further questions, I thank you for this opportunity and the privilege to argue before you today, and I'll take my seat. I see none. Thank you, Ms. Hebert. Thank you. Ms. Fichtel, you have a rebuttal. Thank you, Your Honor. One point of clarification, in that jail phone call that you heard about, Mr. Olson is talking about the gun, but he's very adamant that the gun did not have a scratch on it and the serial number was not scratched off, and that was something that the jury did here. You did also, and also one of the things that I think Judge Schreier had to take into consideration were the factors when she, the factors that she needed to weigh when considering admissibility, which were the nature of the article, the circumstances that surrounded the preservation of the article, and the likelihood of the item being tampered with. Obviously, I wasn't going to get a Perry Mason moment with any of these witnesses. None of those witnesses were going to break down and say I scratched the gun. I learned a long time ago that that just wasn't something that was going to happen, and so my mentor actually had to beat that out of me when I was a young lawyer, and that's why the question wasn't asked for. How I would have gotten at that would have been by impeachment evidence, would have been by evidence that these particular individuals had a propensity to bend the rules, and so I think to those. That's the 28-J information that we were. Yes, Your Honor, and I didn't know if that was appropriate to reference, but I'll let the Court draw my inference. So that's something that I think would have been important for the Court, the lower court here to consider. I also think that the nature of the muddled process in this situation goes to the Yes, it doesn't require a perfect chain of evidence, but it certainly requires law enforcement to do a better job than what they did here, and so it's for that reason that we ask that you remand and request a new trial. Your Honor, it's been a pleasure to be here before you today. Thank you. Thank you, Ms. Fixtel, and the Court notes that you represented your client today under the Criminal Justice Act, and the Court thanks you for your participation on the panel. Thank you.